Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Michael Vanunu (MV 4167)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and          Docket No.:_____ (      )
GEICO CASUALTY COMPANY,

                                        Plaintiffs,

                                                                 **Plaintiff Demands a Trial by Jury**

        -against-

EXON MEDICAL EQUIPMENT, INC., MARK
MASTERS, OLEG YEVDOSIN, RAMY HANNA,
M.D., COLIN CLARKE, M.D. and JOHN DOE
DEFENDANTS 1-10

                                        Defendants.
---------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## INTRODUCTION

1.      This action seeks to recover more than $360,000.00 that the Defendants have

wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of

fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise

unreimbursable durable medical equipment ("DME") and orthotic devices ("OD") (e.g. cervical collars, lumbar-sacral supports, orthopedic pillows, electronic heat pads, egg crate mattresses, etc.) (collectively, the "Fraudulent Equipment") through Defendant Exon Medical Equipment, Inc. ("Exon").

2.      Exon is a durable medical equipment retailer owned and controlled by Oleg Yevdosin ("Yevdosin") and Mark Masters ("Masters").  In short, Yevdosin and Masters devised a scheme in conjunction with various healthcare providers, including Defendants Ramy Hanna, M.D. ("Hanna") and Colin Clarke, M.D. ("Clarke") as well as others who are not presently identifiable, to submit large volumes of billing to GEICO and other New York automobile insurance companies for the delivery of Fraudulent Equipment that was medically unnecessary, illusory, and otherwise not reimbursable.

3.      Based upon prescriptions for Fraudulent Equipment that were purportedly issued by various healthcare providers, including Hanna and Clarke (collectively, the "Referral Defendants") – Exon, Yevdosin, and Masters (collectively the "Supplier Defendants") allegedly provided Fraudulent Equipment to individuals who claimed to have been involved in automobile accidents and were eligible for coverage under no-fault insurance policies issued by GEICO ("Insureds").

4.      GEICO seeks to recover more than $360,000.00 that has been wrongfully obtained by the Supplier Defendants and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $375,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Exon because:

(i)      The Supplier Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and provided – to the extent that any Fraudulent Equipment was provided – pursuant to predetermined fraudulent protocols with the Referral Defendants and other healthcare

providers – either directly or through third-party individuals who are not presently identifiable – solely to financially enrich the Defendants, other healthcare providers, and others not presently known, rather than to treat the Insureds;

(ii)     The Supplier Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent that any Fraudulent Equipment was provided – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referral Defendants or other healthcare providers who are licensed to issue such prescriptions.

(iii)    The bills for Fraudulent Equipment submitted to GEICO by the Supplier Defendants fraudulently misrepresented that the Fraudulent Equipment was provided to Insureds when the Insureds never received the Fraudulent Equipment; and

(iv)     To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by the Supplier Defendants fraudulently mispresented the type and nature of the DME and OD purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent what was provided to Insureds.

5.     The Defendants fall into the following categories:

(i)     Defendant Exon is a New York corporation that purports to purchase DME and OD from various wholesale dealers, purports to provide Fraudulent Equipment to automobile accident victims, and bills New York automobile insurance companies, including GEICO, for Fraudulent Equipment.

(ii)     Defendants Yevdosin and Masters own and control Exon, and through Exon submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims.

(iii)    Defendant Hanna is a physician licensed to practice medicine in New York and purportedly issued prescriptions for Fraudulent Equipment that was billed by the Supplier Defendants to New York automobile insurance companies, including GEICO.

(iv)     Defendant Clarke is a physician licensed to practice medicine in New York and purportedly issued prescriptions for Fraudulent Equipment that was billed by the Supplier Defendants to New York automobile insurance companies, including GEICO.

6.      As discussed below, the Defendants always have known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because:

(i)     The prescriptions for Fraudulent Equipment were not medically necessary and the Fraudulent Equipment was provided – to the extent that any Fraudulent Equipment was provided – pursuant to predetermined fraudulent protocols designed by the Defendants and other healthcare providers – either directly or through third-party individuals who are not presently identifiable – solely to financially enrich the Defendants, other healthcare providers, and others not presently known, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)    The Fraudulent Equipment was provided – to the extent that any Fraudulent Equipment was provided – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referral Defendants or other healthcare providers who are licensed to issue such prescriptions;

(iii)   The bills for Fraudulent Equipment submitted by the Supplier Defendants to GEICO – and other New York automobile insurers – fraudulently misrepresented that the Supplier Defendants provided Fraudulent Equipment to Insureds when the Insureds never received the Fraudulent Equipment; and

(iv)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by the Supplier Defendants to GEICO – and other New York automobile insurers – fraudulently mispresented the type and nature of the DME and OD purportedly provided to the Insureds as the HCPCS Codes identified in the bills did not accurately represent what was actually provided to Insureds.

7.      As such, the Supplier Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through Exon.

8.      The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to GEICO pursuant to the Defendants' fraudulent scheme.

9. Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry began no later than January 1, 2014 and the scheme has continued uninterrupted since that time.

10. As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $360,000.00.

## THE PARTIES

### I.   Plaintiffs

11. Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

### II.   Defendants

#### A.   The Supplier Defendants

12. Defendant Exon is a New York corporation with its principal place of business in Brooklyn, New York.  Exon was incorporated on September 1, 2011, is owned and controlled by Yevdosin and Masters, and has been used by Yevdosin and Masters, the Referral Defendants, and others not presently identifiable by GEICO as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

13. Defendant Yevdosin resides in and is a citizen of New York.  Yevdosin is one of the owners of Exon, and together with Masters, has controlled Exon and entered into unlawful financial arrangements with the Referral Defendants and other healthcare providers, either directly or through third-party individuals who are not presently identifiable, in exchange for referrals to Exon for the Fraudulent Equipment.

14.     Defendant Masters resides in and is a citizen of New York.  Masters is one of the owners of Exon, and together with Yevdosin, has controlled Exon and entered into unlawful financial arrangements with the Referral Defendants and other healthcare providers, either directly or through third-party individuals who are not presently identifiable, in exchange for referrals to Exon for the Fraudulent Equipment.

15.     The Supplier Defendants are no strangers to engaging in fraudulent schemes against automobile insurance carriers and have engaged in fraudulent schemes against other New York automobile insurance carriers, including one nearly identical to the scheme identified here against GEICO. By way of example, on or about April 23, 2019, Exon and Yevdosin were named in a lawsuit filed in United States District Court for the Eastern District of New York in an action entitled <u>Allstate Insurance Company, et al. v. Rachida Amirova, et al.</u>, Case No. 1:19-cv-02354-EK-LB in which they were alleged to have submitted fraudulent claims seeking No-Fault benefits for DME and OD purportedly provided to Allstate's insureds because the bills misrepresented the DME and OD purportedly provided to Allstate's insureds. The action resolved shortly after the commencement of discovery.

### B.     The Referral Defendants

16.     Defendant Hanna resides in and is a citizen of New York. Hanna became licensed to practice medicine in New York on or about December 23, 1998.  Hanna purportedly treated automobile accident victims at a multi-disciplinary medical office that catered to a high volume of no-fault insurance patients located at 2273 65th St., Brooklyn, New York ("the 65th Street Clinic"). Hanna issued many prescriptions for Fraudulent Equipment that were purportedly provided by the Supplier Defendants and were part of the fraudulent claims identified in Exhibit "1".

17.     Defendant Clarke resides in and is a citizen of New York. Clarke became licensed to practice medicine in New York on or about September 11, 1997. Clarke purportedly treated automobile accident victims from several multi-disciplinary medical offices that catered to a high volume of no-fault insurance patients throughout the New York metropolitan area, including: (i) 488 Lafayette Avenue, Brooklyn, New York ("the Lafayette Ave Clinic":); (ii) 214-29 Jamaica Avenue, Queens Village, New York ("the Jamaica Ave Clinic":); and (iii) 560 Prospect Avenue, Bronx, New York ("the Prospect Ave Clinic"). Clarke issued many prescriptions for Fraudulent Equipment that were purportedly provided by the Supplier Defendants and were part of the fraudulent claims identified in Exhibit "1".

18.     Clarke is no stranger to illicit conduct. On or about September 29, 2009, Clarke was charged with professional misconduct by New York's Office of Professional Medical Conduct by failing to adequately supervise his staff in their performance, evaluation, and documentation of examinations and electrodiagnostic testing. On or about October 22, 2009, Clarke entered into a consent agreement which resulted in the suspension of his medical license for three years, which was stayed for three years of probation and the payment of a $10,000.00 fine.  In addition, as a result of the disciplinary proceeding, Clarke was permanently barred from: (i) performing or interpreting any electrodiagnostic nerve and muscle studies; and (ii) forming, owning, controlling, or practicing under the auspices of more than one professional medical corporation.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

20.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

21.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

22.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred, and where one or more of the Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

23.     GEICO underwrites automobile insurance in the State of New York.

## I.     An Overview of the Pertinent Laws

### A.     Pertinent Laws Governing No-Fault Insurance Reimbursement

24.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

25.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

26.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. See N.Y. Ins. Law § 5102(a).

27.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

28.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

29.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

30.     New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME or OD. See, e.g., New York Education Law §§ 6509-a; and 6531.

31.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". See New York Education Law § 6530(17).

32.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

33.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services,

using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

34.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

35.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

36.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.     Pertinent Regulations Governing No-Fault Benefits for DME and OD**

37.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME or OD that was provided pursuant to a prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME or OD that was provided without a prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

38.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), hot/cold packs, infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, and whirlpool baths.

39.     OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of joints, spine, or limbs. These devices come in direct contact with the outside of the body, and include such items as cervical collars (i.e., "whiplash" collars), lumbar supports, knee orthotics, ankle supports, wrist braces, and the like.

40.     To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME or OD charges the maximum charges that may be submitted by healthcare providers for DME and OD are set forth in the NY Fee Schedule.

41.     In a June 16, 2004 Opinion Letter, which is attached as Exhibit "2", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME and OD charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

42.     As it relates to DME and OD, the NY Fee Schedules sets forth the maximum charges as follows:

> (a)     The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee

> payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:
>
> (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or
>
> (2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2

43.     As indicated by the NY Fee Schedule, payment for DME or OD is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

44.     According to the NY Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME or OD is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule"). Alternatively, where a specific DME or OD is not identified in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as GEICO to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

45.     For Non-Fee Scheduled items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See Exhibit "2".

46.     For Fee-Scheduled items, Noridian Healthcare Solutions, LLC ("Noridian"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning Healthcare Common Procedure Coding System ("HCPCS") Codes that should be used by DME and OD companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME or OD must meet in order to qualify for reimbursement under a specific HCPCS Code.

47.     The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Noridian. Medicaid has specifically defined the HCPCS Codes contained within the Medicaid Fee Schedule in its Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines ("Medicaid DME Procedure Codes") which mimic the definitions set forth by Noridian.

48.     To the extent that bills for No-Fault Benefits are for dispensed DME and/or OD that are Non-Fee Schedule items and the HCPCS Codes are not within the Medicaid DME Procedure Codes, the definitions for set forth by Noridian control to determine whether an item of DME or OD qualify for reimbursement under a specific HCPCS Code.

49.     Additionally, many HCPCS Codes related to OD has either been prefabricated, custom-fitted, and/or customized. Noridian published a guide to differentiating between custom-fitted items and off-the-shelf/pre-fabricated items, entitled, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised. As part of its coding guide, Noridian has identified who is qualified to properly provide custom-fitted OD.

50.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)     The provider received a legitimate prescription for reasonable and medically necessary DME and/or OD from a healthcare practitioner that is licensed to issue such prescriptions;

(ii)    The prescription for DME or OD is not based any unlawful financial arrangement;

(iii)   The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription;

(iv)    The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and

(v)     The fee sought for the DME or OD was not in excess of either the Medicaid Fee Schedule or the standard for a Non-Fee Schedule item.

## II.     The Defendants' Fraudulent Scheme

51.     Beginning no later than January 2014, the Defendants and others not presently known to GEICO masterminded and implemented a complex fraudulent scheme wherein Exon was used as a vehicle to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits to which they were never entitled to receive.

### A.     Overview of the Defendants' Fraudulent Schemes

52.     Between January 1, 2014 and the present, the Supplier Defendants, through Exon, submitted more than $1,500,000.00 in fraudulent claims to GEICO seeking reimbursement for the Fraudulent Equipment. To date, the Supplier Defendants have wrongfully obtained more than $360,000.00 from GEICO, and there is more than $375,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the Supplier Defendants continue to seek payment of from GEICO.

53.     Subsequent to Yevdosin's ownership and operations of Lada Management, Inc., an entity used to secretly own and control medical professional corporations that catered to volumes of patients with no-fault insurance, Yevdosin partnered with Masters to form Exon as a way to directly obtain No-Fault Benefits and maximize the amount of No-Fault Benefits they could obtain by submitting fraudulent bills to GEICO and other automobile insurers.

54.     As part of this scheme, the Supplier Defendants obtained generic and vague prescriptions (which were written in that manner by design) for Fraudulent Equipment from the Referral Defendants and other healthcare providers who treated Insureds at multi-disciplinary medical offices in the New York metropolitan region that cater to high volumes of no-fault insurance patients.

55.     Once the Supplier Defendants received the intentionally vague and generic prescriptions from healthcare providers, including the Referral Defendants, the Supplier Defendants would submit either NF-3 or HCFA-1500 forms to GEICO seeking reimbursement for specific types of Fraudulent Equipment with HCPCS Codes that were not directly identified in the prescriptions.

56.     By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the Supplier Defendants indicated that they provided Insureds with the particular items associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by a healthcare provider licensed to prescribe DME and/or OD.

57.     However, to the extent that any Fraudulent Equipment was actually provided to Insureds, the Fraudulent Equipment did not match the HCPCS Codes identified in the bills submitted by the Supplier Defendants.

58.     Instead, the Supplier Defendants provided Insureds with inexpensive and poor-quality Fraudulent Equipment, which did not contain all the features required by the applicable HCPCS Codes, to the extent that any Fraudulent Equipment was provided to the Insureds in the first instance.

59.     As part of this scheme, the Supplier Defendants used the intentionally generic and vague prescriptions to unlawfully choose one of many variations of DME and/or OD that could be provided to the Insureds. As a result, in virtually every circumstance available, the Supplier Defendants purported to provide the Insureds with a variation that had a high – if not one of the highest – maximum reimbursement rates under the Medicaid Fee Schedule.

60.     In addition to unlawfully choosing specific type of Fraudulent Equipment to provide Insureds, the Fraudulent Equipment actually provided did not match the HCPCS Codes identified in the bills to GEICO as the items were of inferior quality and without the specific features required by the applicable HCPCS Codes, to the extent that any Fraudulent Equipment was actually provided to Insureds.

61.     In fact, the Fraudulent Equipment actually provided to Insureds – and again to the extent that any Fraudulent Equipment was actually provided – would qualify under different HCPCS Codes that had significantly lower maximum reimbursement rates than the HCPCS Codes actually identified in the bills submitted by the Supplier Defendants to GEICO seeking reimbursement of No-Fault Benefits.

62.     The Supplier Defendants were able to perpetrate this scheme due to secret agreements with the Referral Defendants and other healthcare providers, either directly or through third-party individuals who are not presently identifiable.

63.     As part of this scheme, the Referral Defendants and other healthcare providers would regularly and intentionally provide the same type of prescriptions for generic and vague Fraudulent Equipment to virtually every Insured that was injured in a motor vehicle accident. Typically thereafter, someone on behalf of the Referral Defendants and other healthcare providers would – without going through the Insureds – request that the Supplier Defendants provide the Insureds with Fraudulent Equipment identified on the prescriptions.

64.     Upon information and belief, the Referral Defendants and other healthcare providers would agree to participate in this scheme in exchange for various forms of consideration.

65.     By providing generic and vague prescriptions to the Supplier Defendants, the Referral Defendants and other healthcare providers intentionally enabled the Supplier Defendants to bill GEICO for: (i) Fraudulent Equipment that was not reasonable or medically necessary; (ii) Fraudulent Equipment that was not based on valid prescriptions from licensed healthcare providers; (iii) Fraudulent Equipment that was not provided to Insureds; (iv) Fraudulent Equipment that did not represent the HCPCS codes contained in the bills to GEICO; and (v) Fraudulent Equipment that was otherwise unreimbursable.

**B.     The Defendants' Fraudulent Prescription-Issuing Protocol**

66.     In support of the fact that the bills submitted to GEICO from the Supplier Defendants for Fraudulent Equipment were pursuant to fraudulent schemes between the Defendants and other healthcare providers – third-party individuals who are not presently identifiable – the prescriptions provided to the Supplier Defendants were the result of predetermined fraudulent protocols designed to maximize the billing that the Supplier

Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

67.     Upon information and belief, in the claims identified in Exhibit "1", virtually all of the Insureds whom the Supplier Defendants purported to provide Fraudulent Equipment for were involved in relatively minor and low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

68.     Concomitantly, almost none of the Insureds identified in Exhibit "1", whom the Referral Defendants and other healthcare providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

69.     In keeping with the fact that the Insureds identified in Exhibit "1" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidently, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

70.     To the extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and then sent on their way with nothing more serious than a minor soft tissue injury such as a sprain or strain.

71.     However, despite virtually all of the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds at each of the healthcare providers who referred patients to the Supplier Defendants – including the Referral Defendants – were

subject to extremely similar treatment including nearly identical prescriptions for Fraudulent Equipment.

72.     The Referral Defendants and other healthcare providers issued prescriptions for Fraudulent Equipment to Insureds pursuant to predetermined fraudulent protocols without regard for the Insureds' individual symptoms or presentation.

73.     No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit the fraudulent protocols described below to proceed under his, her, or its auspices.

74.     The healthcare providers, including the Referral Defendants, permitted the predetermined fraudulent protocols described below, which were not medically necessary, to proceed under their auspices because the Defendants sought to profit from the fraudulent billing submitted to GEICO and other New York automobile insurers.

75.     Overall, the predetermined fraudulent protocols had a similar pattern for every healthcare provider that purportedly treated Insureds, including the Referral Defendants, and was typically as follows:

- the Insured would arrive at a multi-disciplinary medical office for treatment subsequent to a motor vehicle accident;

- the Insured would be seen either by a physician, chiropractor, physician's assistant, or nurse practitioner;

- on the date of the first visit, the healthcare provider would direct the Insured to undergo conservative treatment and purportedly provide a prescription for Fraudulent Equipment; and

- the prescription for Fraudulent Equipment was sent directly to the Supplier Defendants without any involvement by the Insured.

76.     Furthermore, for each healthcare provider who purportedly issued prescriptions for Fraudulent Equipment, virtually all of the prescriptions issued to the Insureds were for virtually the same type of Fraudulent Equipment.

77.     In a legitimate setting, when a patient injured in a motor vehicle accident sought treatment by a healthcare provider, the patient's subjective complaints would be evaluated, and the treating provider would direct a specific course of treatment based upon the patient's individual symptoms or presentation.

78.     Furthermore – and again in a legitimate setting – during the course of a patient's treatment, a healthcare provider <u>may</u> – but not always – prescribe DME and/or OD that would aid in the treatment of the patient's symptoms.

79.     In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider would evaluate multiple factors, including: (i) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD would likely help improve the patient's complained of condition; and (iii) whether the patient would use the DME and/or OD. In all circumstances, the specific DME and/or OD prescribed would always directly relate to each patient's individual symptoms or presentation.

80.     There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

81.     An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

82.     It is improbable that two or more Insureds involved in any single motor vehicle accident would suffer substantially similar injuries or exhibit substantially similar symptomatology as the result of the accident.

83.     It is extremely improbable that two or more Insureds involved in any single motor vehicle accident not only would suffer from substantially similar injuries and symptomatology but would need virtually the same specific items of DME and/or OD to aid in treating their individual symptoms.

84.     It is extremely improbable – to the point of impossibility – that this legitimately would occur over and over again, with two or more Insureds who were involved in the same accident repeatedly being prescribed virtually the same specific items of DME and/or OD to aid in treating their individual symptoms.

85.     If two or more Insureds who were involved in the same underlying motor vehicle accident received virtually identical prescriptions for Fraudulent Equipment then, by extension, all of the Insureds who were involved in the same underlying motor vehicle accident had virtually identical complaints and virtually identical symptoms.

86.     In keeping with the fact that the Referral Defendants and other healthcare providers that prescribed the Fraudulent Equipment purportedly provided by the Supplier Defendants pursuant to predetermined fraudulent protocols – and not based upon medical necessity – in virtually all cases when two or more Insureds were involved in the same accident the healthcare provider issued virtually identical prescriptions for Fraudulent Equipment.

87.     It is also extremely improbable – to the point of impossibility – that virtually every Insured who treated at a specific healthcare provider, such as Hanna or Clarke, would receive prescriptions for numerous items of Fraudulent Equipment of virtually the same type

despite being different ages, in different physical conditions, involved in different motor vehicle accidents.

88.     Virtually every Insured receiving multiple items of identical Fraudulent Equipment would, by extension, mean that virtually every Insured who reported to a specific healthcare provider complained of the exact same symptoms and exhibited identical weaknesses in their physical conditions.

89.     In further keeping with the fact that the Referral Defendants and other healthcare providers that prescribed the Fraudulent Equipment purportedly provided by the Supplier Defendants pursuant to predetermined fraudulent protocols – and not based upon medical necessity – virtually every patient who treated with an individual healthcare provider was issued virtually identical prescriptions for Fraudulent Equipment.

90.     It is also extremely improbable – to the point of impossibility – that virtually every Insured identified in Exhibit "1", regardless which healthcare provider the Insured treated with, would receive a prescription containing identical items of Fraudulent Equipment.

91.     Virtually every Insured receiving identical Fraudulent Equipment would, by extension, mean that virtually every Insured complained of the identical symptoms and exhibited identical weaknesses in their physical conditions.

92.     However – and again in keeping with the fact that the Fraudulent Equipment were prescribed pursuant to predetermined fraudulent protocols – and not based upon medical necessity – virtually every Insured identified in Exhibit "1", regardless which healthcare provider issued the prescription, was purportedly prescribed – at a minimum – the following Fraudulent Equipment: (i) a lumbar orthotic; (ii) a cushion/pillow; and (iii) an electric heat pad (also known as a thermophore).

93.    Upon information and belief, and in further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were part of predetermined fraudulent protocols – and not based upon medical necessity – the prescriptions issued by the Referral Defendants and the other healthcare providers were never given to the Insureds but were routed directly to the Supplier Defendants.

94.    In fact, in many cases, and to the extent that the Insureds received any Fraudulent Equipment, the Insureds were provided with Fraudulent Equipment directly from receptionists at the healthcare providers' offices, without any interaction with the Supplier Defendants.

95.    In further keeping with the fact that Fraudulent Equipment were prescribed pursuant to predetermined fraudulent protocols – and not based upon medical necessity – the specific Fraudulent Equipment contained on the prescriptions usually contravened the Insureds' conservative treatment plans.

96.    For example, and as indicated below, virtually every Insured identified in Exhibit "1" was provided with at least one prescription for Fraudulent Equipment that called for immobilizing devices, such as a lumbosacral brace (sometimes referred to as "lumbar orthotic" or "LSO") and a cervical collar. By contrast, virtually every Insured was also prescribed physical therapy treatments which called for the bending and stretching to strengthen weakened parts of the body.

97.    The purportedly prescribed immobilizing devices completely contravene the physical therapy treatments that the Insureds were also prescribed. In the context of treatment for injuries related to minor and low-impact motor vehicle accidents, no legitimate physician, chiropractor, or other licensed healthcare provider acting in each patient's best interest would prescribe both physical therapy and immobilizing devices at the same time.

98.     In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were part of predetermined fraudulent protocols, and not for the benefit of the Insureds – as set forth below – the prescriptions were purposefully generic and vague so as to allow the Supplier Defendants to choose the specific type of Fraudulent Equipment that they billed GEICO and other New York automobile insurers, in order to increase their financial gain.

**1.     The Predetermined Fraudulent Protocol with Hanna**

99.     Hanna, either directly or through the aid of third-party individuals who are not presently known, agreed to participate in a predetermined fraudulent protocol with the Supplier Defendants.

100.    As described above, subsequent to their involvement in minor "fender-bender" motor vehicle accidents, virtually all of the Insureds identified in Exhibit "1" who treated with Hanna visited the 65th Street Clinic and were purportedly provided with initial examinations. Subsequent to the initial examinations, each of the Insureds identified in Exhibit "1" that purportedly treated with Hanna was prescribed Fraudulent Equipment.

101.    When the Insureds sought treatment with and were purportedly evaluated by Hanna, Hanna did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide. Rather, Hanna purportedly issued prescriptions for Fraudulent Services to the Insureds based upon the predetermined fraudulent protocol established with the Supplier Defendants.

102.    In keeping with the fact that the prescriptions purportedly issued by Hanna were not medically necessary and were provided pursuant to the predetermined fraudulent protocol, virtually every Insured who treated with Hanna and Bay Medical received a prescription for virtually the same type of Fraudulent Equipment.

103.     More specifically, Hanna used a checklist form to document the Insureds' initial examinations. The last page of that checklist form had a specific area for Hanna to mark what Fraudulent Equipment he would purportedly prescribe the Insureds. Indeed, the checklist form contained only six categories, which included: (i) cervical collar; (ii) lumbar support; (iii) knee support; (iv) orthopedic pillow; (v) thermophore; and (vi) "Other _____".

104.     As such, regardless of the type of motor vehicle accident, the age of the patient, the patient's physical condition, the patient's subjective complaints, or whether the patient would actually use the Fraudulent Equipment, Hanna virtually always purported to prescribe, at a minimum, the following Fraudulent Equipment to every Insured that he treated identified in Exhibit "1":

    (i)     Orthopedic Pillow:

    (ii)    Thermophore; and

    (iii)   LS Support Brace.

105.     Frequently, and in addition to the three items described above, Hanna would prescribe a cervical collar and/or knee support to Insureds.

106.     For example:

    (i)     On January 25, 2018, a patient named AL was purportedly involved in a motor vehicle accident. AL purportedly started treating with Hanna on February 14, 2018. On the date of AL's initial examination by Hanna, Hanna purportedly issued a prescription in the name of AL that was provided to the Supplier Defendants as part of their predetermined fraudulent protocol for the following Fraudulent Equipment: (i) a LS support brace; (ii) a thermophore; (iii) an orthopedic pillow; and a knee supports for both knees.

    (ii)    On August 21, 2018, a patient named CR was purportedly involved in a motor vehicle accident. CR purportedly started treating with Hanna on August 31, 2018, less than two weeks after the accident. On the date of CR's initial examination by Hanna, Hanna purportedly issued a prescription in the name of CR that was provided to the Supplier Defendants as part of their predetermined fraudulent protocol for the

following Fraudulent Equipment: (i) a LS support brace; (ii) a thermophore; and (iii) an orthopedic pillow.

(iii)    On March 5, 2019, a patient named SK was purportedly involved in a motor vehicle accident. SK purportedly started treating with Hanna on March 6, 2019, one day after the accident. On the date of SK's initial examination by Hanna, Hanna purportedly issued a prescription in the name of SK that was provided to the Supplier Defendants as part of their predetermined fraudulent protocol for the following Fraudulent Equipment: (i) a LS support brace; (ii) a thermophore; (iii) an orthopedic pillow; and (iv) a cervical collar.

(iv)    On April 8, 2019, a patient named LE was purportedly involved in a motor vehicle accident. LE purportedly started treating with Hanna on May 2, 2019. On the date of LE's initial examination by Hanna, Hanna purportedly issued a prescription in the name of LE that was provided to the Supplier Defendants as part of their predetermined fraudulent protocol for the following Fraudulent Equipment: (i) a LS support brace; (ii) a thermophore; (iii) an orthopedic pillow; and (iv) a knee supports for both knees.

(v)    On May 2, 2019, a patient named TL was purportedly involved in a motor vehicle accident. TL purportedly started treating with Hanna on May 15, 2019, less than two weeks after the accident. On the date of TL's initial examination by Hanna, Hanna purportedly issued a prescription in the name of TL that was provided to the Supplier Defendants as part of their predetermined fraudulent protocol for the following Fraudulent Equipment: (i) a LS support brace; (ii) a thermophore; and (iii) an orthopedic pillow.

107.    These are only representative samples. In fact, in virtually all of the claims for Fraudulent Equipment identified in Exhibit "1" that are associated with Hanna, the prescriptions virtually always requested a LS support brace, a thermophore, and an orthopedic pillow, and many times also requested a cervical collar and/or knee support brace.

108.    In keeping with the fact that each prescription for Fraudulent Equipment was pursuant to a predetermined fraudulent protocol as a result of an unlawful financial arrangement, it is notable that: (i) the items of Fraudulent Equipment provided by the Supplier Defendants were generally prescribed at the time of the initial evaluation, and virtually never at or subsequent to the Insureds' follow-up examinations; (ii) to the extent that the Insureds returned

to Hanna for follow-up examinations, any additional prescriptions for Fraudulent Equipment were not provided to or filled by the Supplier Defendants, but rather by a separate and singular DME/OD provider: and (iii) Insureds received virtually the same Fraudulent Equipment regardless of their individual circumstances, complaints, and physical conditions.

109.    In fact, when two or more Insureds who were involved in the same underlying motor vehicle accident sought treatment with Hanna, those Insureds virtually always received virtually identical prescriptions for Fraudulent Equipment.

110.    For example:

(i)     On May 24, 2017, two Insureds – AC and DZ – were involved in the same automobile accident. Thereafter, AC and DZ both sought treatment with Hanna. AC and DZ were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to Hanna's initial examinations of AC and DZ, Hanna prescribed virtually identical prescriptions for Fraudulent Equipment to AC and DZ, which included: (i) a thermophore; (ii) a cervical pillow; and (iii) a LS support Brace.

(ii)    On July 7, 2018, two Insureds – EM and AW – were involved in the same automobile accident. Thereafter, EM and AW both sought treatment with Hanna. EM and AW were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to Hanna's initial examinations of EM and AW, Hanna prescribed virtually identical prescriptions for Fraudulent Equipment to EM and AW, which included: (i) a thermophore; (ii) a cervical pillow; and (iii) a LS support Brace.

(iii)   On March 11, 2019, two Insureds – JC and YF – were involved in the same automobile accident. Thereafter, JC and YF both sought treatment with Hanna. JC and YF were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to Hanna's initial examinations of JC and YF, Hanna prescribed virtually identical prescriptions for Fraudulent Equipment to JC and YF, which included: (i) a thermophore; (ii) a cervical pillow; and (iii) a LS support Brace.

(iv)    On September 11, 2019, two Insureds – CM and DP – were involved in the same automobile accident. Thereafter, CM and DP both sought treatment with Hanna. CM and DP were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to Hanna's initial examinations of CM and DP, Hanna prescribed virtually identical prescriptions for Fraudulent Equipment to CM and DP, which included: (i) a thermophore; and (ii) a LS support Brace.

(v)     On September 12, 2019, two Insureds – FH and DM – were involved in the same automobile accident. Thereafter, FH and DM both sought treatment with Hanna. FH and DM were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to Hanna's initial examinations of FH and DM, Hanna prescribed virtually identical prescriptions for Fraudulent Equipment to FH and DM, which included: (i) a thermophore; and (ii) a cervical pillow.

111.    These are only representative examples. In virtually all of the claims for Fraudulent Equipment identified in Exhibit "1" that are associated with Hanna and where two or more Insureds were involved in the same underlying accident, Hanna typically prescribed virtually identical prescriptions despite the fact that the Insureds were differently situated.

112.    As part of the fraudulent scheme, virtually all of the prescriptions for a "LS Support Brace" routinely contravened the Insureds' conservative treatment plans.  For example, Hanna systemically prescribed lumbar orthotic devices which immobilize the patient while directing the Insureds to undergo physical therapy regimens, which would require prolonged bending and stretching of weakened parts of the body, including the spine. In this context, Hanna's prescriptions for lumbar orthotic devices completely contravened the physical therapy treatments also prescribed by Hanna. No legitimate treatment regimen would involve the simultaneous prescription of physical therapy and immobilizing devices.

113.    Additionally, as part of the fraudulent scheme, the prescriptions issued by Hanna were never given to the Insureds but were routed directly to the Supplier Defendants, thus taking

any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the 65th Street Clinic, without any interaction with or instruction concerning their use from either the Supplier Defendants or Hanna.

114.    Additionally as part of the fraudulent scheme, the prescriptions issued by Hanna were purposefully generic and vague so as to allow the Supplier Defendants to choose the specific type of Fraudulent Equipment that they purported to provide Insureds and bill GEICO and other New York automobile insurers, in order to increase their financial gain.

115.    By way of example, rather than specifying the type of lumbar orthotic devices that Hanna's patients should receive by providing a specific HCPCS Code – or a detailed description that could only be associated with one type of HCPCS Code – Hanna simply issued prescriptions containing the phrase "LS support brace" with the intent of enabling the Supplier Defendants to select specific types of OD that were more highly priced and profitable, instead of issuing prescriptions for OD that were actually needed in the first instance.

### 2.    The Predetermined Fraudulent Protocol Involving Clarke

116.    Similar to the scheme between Hanna and the Supplier Defendants, Clarke, either directly or through the aid of third-party individuals who are not presently known, agreed to participate in a predetermined fraudulent protocol with the Supplier Defendants.

117.    As described above, subsequent to their involvement in minor "fender-bender" motor vehicle accidents, virtually all of the Insureds identified in Exhibit "1" who treated with Clarke visited either the Lafayette Ave Clinic, Jamaica Ave Clinic, or the Prospect Ave Clinic and were purportedly provided with initial examinations.  Subsequent to the initial examinations,

each of the Insureds identified in Exhibit "1" that purportedly treated with Clarke was prescribed Fraudulent Equipment.

118.    When the Insureds sought treatment with and were purportedly evaluated by Clarke, Clarke did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide. Rather, Clarke purportedly issued prescriptions for Fraudulent Services to the Insureds based upon the predetermined fraudulent protocol established with the Supplier Defendants.

119.    In keeping with the fact that the prescriptions purportedly issued by Clarke were not medically necessary and were provided pursuant to the predetermined fraudulent protocol, virtually every Insured who treated with Clarke – regardless which multi-disciplinary Clinic – received a prescription for virtually the same type of Fraudulent Equipment.

120.    As such, regardless of the type of motor vehicle accident, the age of the patient, the patient's physical condition, the patient's subjective complaints, or whether the patient would actually use the Fraudulent Equipment, Clarke virtually always purported to prescribe, at a minimum, the following Fraudulent Equipment to every Insured that he treated identified in Exhibit "1":

(i)      Two-piece cervical collar;

(ii)     Lumbosacral support;

(iii)    Lumbar cushion; and

(iv)    Moist heating pad.

121.    In addition to the three items described above, Clarke would frequently prescribe: (i) a "orthopedic car seat"; (ii) a "knee support"; and/or (iii) a "SAM (sustained acoustical medicine) device" to Insureds.

122.    In keeping with the fact that the prescriptions purportedly issued by Clarke were not medically necessary and provided pursuant to a predetermined fraudulent protocol, Clarke used a typed report to document the Insureds' initial examinations, and the "plan" section of his initial examination reports would regularly stated, "orthopedic car seat, two-piece cervical collar, lumbosacral support, lumbar cushion, moist heating pad". Any additional Fraudulent Equipment that Clarke purported to prescribe would follow "moist heating pad" and the sentence would end with "for home use."

123.    For example:

(i)     On March 13, 2018, a patient named LT was purportedly involved in a motor vehicle accident. LT purportedly started treating with Clarke on April 9, 2018. On the date of LT's initial examination, Clarke's examination report indicated that he would prescribe "two-piece cervical collar, lumbosacral support, lumbar cushion, moist heating pad for home use". Thereafter, Clarke purportedly issued a prescription for those items that was provided to the Supplier Defendants as part of their predetermined fraudulent protocol.

(ii)    On January 24, 2019, a patient named LW was purportedly involved in a motor vehicle accident. LW purportedly started treating with Clarke on January 29, 2019, five days after the accident. On the date of LW's initial examination, Clarke's examination report indicated that he would prescribe "orthopedic car seat, two-piece cervical collar, lumbosacral support, lumbar cushion, moist heating pad, sam device for home use". Thereafter, Clarke purportedly issued a prescription for those items that was provided to the Supplier Defendants as part of their predetermined fraudulent protocol.

(iii)   On February 28, 2019, a patient named TB was purportedly involved in a motor vehicle accident. TB purportedly started treating with Clarke on March 5, 2019, six days after the accident. On the date of TB's initial examination, Clarke's examination report indicated that he would prescribe "two-piece cervical collar, lumbosacral support, lumbar cushion, moist heating pad, sam device for home use". Thereafter, Clarke purportedly issued a prescription for those items that was provided to the Supplier Defendants as part of their predetermined fraudulent protocol.

(iv)    On May 3, 2019, a patient named TK was purportedly involved in a motor vehicle accident. TK purportedly started treating with Clarke on May 6, 2019, three days after the accident. On the date of TK's initial

examination, Clarke's examination report indicated that he would prescribe "orthopedic car seat, two-piece cervical collar, lumbosacral support, lumbar cushion, moist heating pad, sam device for home use. Left knee support." Thereafter, Clarke purportedly issued a prescription for those items that was provided to the Supplier Defendants as part of their predetermined fraudulent protocol.

(v)     On June 2, 2019, a patient named DS was purportedly involved in a motor vehicle accident. DS purportedly started treating with Clarke on June 28, 2019. On the date of DS's initial examination, Clarke's examination report indicated that he would prescribe "orthopedic car seat, two-piece cervical collar, lumbosacral support, lumbar cushion, moist heating pad, sam device for home use". Thereafter, Clarke purportedly issued a prescription for those items that was provided to the Supplier Defendants as part of their predetermined fraudulent protocol.

124.    These are only representative samples. In fact, in virtually all of the claims for Fraudulent Equipment identified in Exhibit "1" that are associated with Clarke, the prescriptions typically requested two-piece cervical collar, lumbosacral support, lumbar cushion, and moist heating pad, and many times also requested an orthopedic car seat, knee support, and/or a SAM device.

125.    In keeping with the fact that each prescription for Fraudulent Equipment was pursuant to a predetermined fraudulent protocol as a result of an unlawful financial arrangement, it is notable that: (i)  the items of Fraudulent Equipment provided by the Supplier Defendants were generally prescribed at the time of the initial evaluation, and virtually never at or subsequent to the Insureds' follow-up examinations; (ii) to the extent that the Insureds returned to Clarke for follow-up examinations, any additional prescriptions for Fraudulent Equipment were not provided to or filled by the Supplier Defendants, but rather by a separate and singular DME/OD provider; and (iii) Insureds received virtually the same Fraudulent Equipment regardless of their individual circumstances, complaints, and physical conditions.

126.    In fact, when two or more Insureds who were involved in the same underlying motor vehicle accident sought treatment with Clarke, those Insureds virtually always received virtually identical prescriptions for Fraudulent Equipment.

127.    For example:

(i)      On March 13, 2018, two Insureds – LT and JA – were involved in the same automobile accident. Thereafter, LT and JA both sought treatment with Clarke. LT and JA were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to Clarke's initial examinations of LT and JA, Clarke prescribed virtually identical prescriptions for Fraudulent Equipment to LT and JA, which included: (i) a two-piece cervical collar; (ii) a lumbosacral support; (iii) a lumbar cushion; and (iv) a moist heating pad.

(ii)     On November 7, 2018, two Insureds – JP and NF – were involved in the same automobile accident. Thereafter, JP and NF both sought treatment with Clarke. JP and NF were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to Clarke's initial examinations of JP and NF, Clarke prescribed virtually identical prescriptions for Fraudulent Equipment to JP and NF, which included: (i) a two-piece cervical collar; (ii) a lumbosacral support; (iii) a lumbar cushion; (iv) a moist heating pad; and (v) a knee support.

(iii)    On January 27, 2019, two Insureds – AB and EN – were involved in the same automobile accident. Thereafter, AB and EN both sought treatment with Clarke. AB and EN were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to Clarke's initial examinations of AB and EN, Clarke prescribed virtually identical prescriptions for Fraudulent Equipment to AB and EN, which included: (i) a two-piece cervical collar; (ii) a lumbosacral support; (iii) a lumbar cushion; and (iv) a moist heating pad.

(iv)     On February 28, 2019, three Insureds – SB, TB, and VK – were involved in the same automobile accident. Thereafter, SB, TB, and VK all sought treatment with Clarke. SB, TB, and VK were different ages, in different physical conditions, and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to Clarke's initial examinations of SB, TB, and VK, Clarke prescribed virtually identical prescriptions for Fraudulent Equipment to SB, TB, and VK, which included: (i) a two-piece

cervical collar; (ii) a lumbosacral support; (iii) a lumbar cushion; and (iv) a moist heating pad.

(v)    On April 12, 2019, two Insureds – AJ and SA – were involved in the same automobile accident. Thereafter, AJ and SA both sought treatment with Clarke. AJ and SA were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol with the Supplier Defendants, subsequent to Clarke's initial examinations of AJ and SA, Clarke prescribed virtually identical prescriptions for Fraudulent Equipment to AJ and SA, which included: (i) a two-piece cervical collar; (ii) a lumbosacral support; (iii) a lumbar cushion; and (iv) a moist heating pad.

128.   These are only representative examples. In virtually all of the claims for Fraudulent Equipment identified in Exhibit "1" that are associated with Clarke and where two or more Insureds were involved in the same underlying accident, Clarke typically prescribed virtually identical prescriptions despite the fact that the Insureds were differently situated.

129.   As part of the fraudulent scheme, virtually all of the prescriptions for a "lumbosacral support" and a "two-piece cervical collar" routinely contravened the Insureds' conservative treatment plans. For example, Clarke systemically prescribed lumbar orthotic devices and cervical collars which immobilize the patient while directing the Insureds to undergo physical therapy, chiropractic, and acupuncture regimens, which would require prolonged bending, stretching, and moving of weakened parts of the body, including the spine. In this context, Clarke's prescriptions for lumbar orthotic devices and cervical collars completely contravened the physical therapy, chiropractic, and acupuncture treatments also prescribed by Clarke. No legitimate treatment regimen would involve prescribing immobilizing devices while simultaneously prescribing physical therapy, chiropractic, and acupuncture regimens.

130.   Additionally, as part of the fraudulent scheme, the prescriptions issued by Clarke were purposefully generic and vague so as to allow the Supplier Defendants to choose the

specific type of Fraudulent Equipment that they purported to provide Insureds and bill GEICO and other New York automobile insurers, in order to increase their financial gain.

131. By way of example, rather than specifying the type of lumbar orthotic devices that Clarke's patients should receive by providing a specific HCPCS Code – or a detailed description that could only be associated with one type of HCPCS Code – Clarke simply issued prescriptions containing the phrase "lumbosacral support" with the intent of enabling the Supplier Defendants to select specific types of OD that were more highly priced and profitable, instead of issuing prescriptions for OD that were actually needed in the first instance.

### C. The Unlawful Distribution of Fraudulent Equipment to Insureds by the Supplier Defendants Without Valid Prescriptions

132. Exon is not a licensed medical professional corporation, and neither Yevdosin nor Masters are licensed healthcare professionals. As such, the Supplier Defendants were not lawfully permitted to prescribe DME and OD to Insureds. For the same reason, the Supplier Defendants cannot properly dispense DME and/or OD to an Insured without a valid prescription from a licensed healthcare professional that definitively identifies the DME and/or OD to be provided.

133. However, in many of the fraudulent claims identified in Exhibit "1", the Supplier Defendants improperly decided what DME and OD to provide to Insureds without a valid definitive prescription from a licensed healthcare provider. More specifically, the prescriptions for DME and/or OD provided to the Supplier Defendants from the Referral Defendants and other healthcare providers were vague and generic because the prescriptions did not definitively identify the DME and/or OD to be provided. For example, the vague and generic prescriptions did not: (i) provide a specific HCPCS Code for the DME and/or OD to be provided; or (ii) provide sufficient detail to direct the Supplier Defendants to a unique type of DME and/or OD.

134.    The vague and generic prescriptions from the Referral Defendants – and other healthcare providers – was intended to and actually provided the Supplier Defendants with the opportunity to select from among several different pieces of Fraudulent Equipment, each having varying reimbursement rates in the Medicaid Fee Schedule.

135.    The Referral Defendants – and other healthcare providers – intended to issue vague and generic prescriptions to and actually provided the Supplier Defendants with the opportunity to select from among several different pieces of Fraudulent Equipment, each having varying reimbursement rates in the Medicaid Fee Schedule.

136.    In a legitimate clinical setting, a DME/OD retailer would contact the referring healthcare provider to request clarification on the specific items that were being requested, including the features and requirements in order to dispense the appropriate DME and/or OD prescribed to each patient. Upon information and belief, the Supplier Defendants never contacted the referring healthcare provider to seek instruction and/or clarification, but rather made their own determination as to the specific Fraudulent Equipment purportedly provided to each Insured. Not surprisingly, the Supplier Defendants elected to provide the Insureds with Fraudulent Equipment that had a reimbursement rate in the higher-end of the permissible range under the Medicaid Fee Schedule.

137.    For example, the prescriptions issued by Clarke that requested a "lumbosacral support" and the prescriptions issued by Hanna that requested a "LS support brace" corresponded to over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount that can be dispensed to Insureds, including:

> (i)    HCPCS Code L0625, a lumbar orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $43.27.

(ii)     HCPCS Code L0626, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $61.25.

(iii)    HCPCS Code L0627, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $322.98.

(iv)    HCPCS Code L0628, a lumbar-sacral orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $65.92.

(v)     HCPCS Code L0629, a lumbar-sacral orthosis device that is flexible and custom fabricated, which has a maximum reimbursement rate of $175.00.

(vi)    HCPCS Code L0630, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $127.26.

(vii)   HCPCS Code L0631, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $ 806.64.

(viii)  HCPCS Code L0632, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is custom fabricated, which has a maximum reimbursement rate of $ 1150.00.

(ix)    HCPCS Code L0633, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $225.31.

(x)     HCPCS Code L0634, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $759.92.

(xi)    HCPCS Code L0635, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is prefabricated, which has a maximum reimbursement rate of $765.98.

(xii)   HCPCS Code L0636, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1036.35.

(xiii)  HCPCS Code L0637, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xiv)  HCPCS Code L0638, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1036.35.

(xv)  HCPCS Code L0639, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xvi)  HCPCS Code L0640, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $822.21.

(xvii)  HCPCS Code L0641, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $53.80.

(xviii)  HCPCS Code L0642, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $283.76.

(xix)  HCPCS Code L0643, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $111.80.

(xx)  HCPCS Code L0648, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $708.65.

(xxi)  HCPCS Code L0649, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $197.95.

(xxii)  HCPCS Code L0650, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

(xxiii)  HCPCS Code L0651, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

138.   As unlicensed healthcare providers, the Supplier Defendants were not legally permitted to determine which of the above-available options were best suited for each Insured based upon a vague prescription for a "lumbosacral support" or "LS support brace".

139.    However, without contacting the Referral Defendants, the Supplier Defendants simply provided virtually every Insured with the same lumbar orthotic of their choosing, and then billed GEICO using HCPCS Code L0650 (at the upper end of the range under the Medicaid Fee Schedule) requesting a reimbursement of $741.59 for each unit, which resulted in hundreds of thousands of needlessly inflated charges to GEICO.

140.    A similar pattern existed with respect to the prescriptions for cervical collars issued by the Referral Defendants. As described above, part of the predetermined fraudulent protocol involved Clarke regularly prescribing a "two-piece cervical collar" and Hanna regularly prescribing a "cervical collar". Even so, the vague and generic language for cervical collars contained in the prescriptions by the Referral Defendants directly relate to the over 10 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount that can be dispensed to Insureds, including:

     (i)    HCPCS Code L0120, a cervical collar device that is a flexible, non-adjustable, foam collar with a maximum reimbursement rate of $6.80.

     (ii)    HCPCS Code L0130, a cervical collar device that is flexible, made of thermoplastic, is molded to the patient, and has a maximum reimbursement rate of $183.99.

     (iii)    HCPCS Code L0140, a cervical collar device that is an adjustable, semi-rigid, plastic collar with a maximum reimbursement rate of $50.00.

     (iv)    HCPCS Code L0150, a cervical collar device that is an adjustable, semi-rigid, plastic collar with a molded chin cup and a mandibular/occipital piece, and has a maximum reimbursement rate of $74.00.

     (v)    HCPCS Code L0160, a cervical collar device that is semi-rigid with a wire frame mandibular/occipital support, which is pre-fabricated, off-the-shelf, and has a maximum reimbursement rate of $79.50.

     (vi)    HCPCS Code L0170, a cervical collar device that is molded to the patient, and has a maximum reimbursement rate of $357.00.

(vii)   HCPCS Code L0172, a two-piece cervical collar device that is semi-rigid, made of thermoplastic foam, prefabricated, off-the-shelf, and has a maximum reimbursement rate of $75.00.

(viii)  HCPCS Code L0174, a two-piece cervical collar device with a thoracic extension that is semi-rigid, made of thermoplastic foam, prefabricated, off-the-shelf, and has a maximum reimbursement rate of $130.00.

(ix)    HCPCS Code L0180, a cervical collar device that is adjustable and has multiple posts including occipital/mandibular supports and has a maximum reimbursement rate of $233.00.

(x)     HCPCS Code L0190, a cervical collar device that is adjustable, has multiple posts including occipital/mandibular supports, has cervical bars, and has a maximum reimbursement rate of $311.75.

(xi)    HCPCS Code L0200, a cervical collar device that is adjustable, has multiple posts including occipital/mandibular supports, has cervical bars, a thoracic extension, and has a maximum reimbursement rate of $322.50.

141.    As with the prescriptions for lumbar orthotic devices, the Supplier Defendants were not legally permitted to determine which of the above-available options were best suited for each Insured that had a prescription for a "two-piece cervical collar" or – even more generally – a "cervical collar".

142.    However, without contacting the Referral Defendants, the Supplier Defendants simply provided virtually every Insured with the same cervical collar of their choosing, and then billed GEICO using HCPCS Code L0180 (at the upper end of the range under the Medicaid Fee Schedule) requesting a reimbursement of $233.00 for each unit, which resulted in hundreds of thousands of needlessly inflated charges to GEICO.

143.    In reality, the Supplier Defendants unlawfully prescribed the Fraudulent Equipment because they decided which specific items of DME and/or OD to provide to the Insureds. These decisions by the Supplier Defendants were not based on: (i) prescriptions by licensed healthcare providers containing sufficient detail to identify unique types DME and/or OD; or (ii) the medical necessity of the specific items dispensed in relation to the Insureds.

Rather, the decisions by the Supplier Defendants were solely based on their own financial enrichment. As a result, the Supplier Defendants were never eligible for reimbursement of No-Fault Benefits.

### D.   The Supplier Defendants' Fraudulent Billing for DME and/or OD

144.   The bills submitted bills to GEICO and other New York automobile insurers by the Supplier Defendants were also fraudulent in that they misrepresented the DME and OD that was purportedly provided to the Insureds.

145.   In the bills and other documents submitted to GEICO, the Supplier Defendants misrepresented that the prescriptions relating to Fraudulent Equipment were for reasonable and medically necessary items when the prescriptions for Fraudulent Equipment were based – not upon medical necessity but – solely on predetermined fraudulent protocols in exchange for various forms of consideration between the Supplier Defendants and the Referral Defendants, other healthcare providers, and others who are not presently known.

146.   Further, the Supplier Defendants misrepresented in the bills submitted to GEICO that the Fraudulent Equipment purportedly provided to Insureds were based upon prescriptions issued by licensed healthcare providers authorized to issue such prescriptions, when the Fraudulent Equipment purportedly provided were based upon prescriptions issued by laypersons and/or decisions made by laypersons.

147.   Moreover, and as explained below, the bills submitted to GEICO by the Supplier Defendants misrepresented: (i) that specific Fraudulent Equipment was provided to the Insureds, when in fact they were not; and (ii) to the extent Fraudulent Equipment was provided, the type of Fraudulent Equipment provided matched the HCPCS Codes identified in the bills to GEICO, when in fact they did not.

**1. The Supplier Defendants' Fraudulently Misrepresented that Fraudulent Equipment Was Provided**

148.    When the Supplier Defendants submitted bills to GEICO and other New York automobile insurers, they represented that Fraudulent Equipment was actually provided to the Insureds. However, many of the bills for Fraudulent Equipment misrepresented that Fraudulent Equipment was provided to the Insureds because – in reality – the Insureds never received all of the Fraudulent Equipment billed by the Supplier Defendants.

149.    As indicated above, it was part of the Defendants' predetermined fraudulent protocol to allow the Supplier Defendants to maximize the billing submitted to GEICO for No-Fault Benefits.

150.    Accordingly, the Referral Defendants and other healthcare provided medically unnecessary prescriptions to the Supplier Defendants for Fraudulent Equipment, which the Supplier Defendants used as the basis for the bills that they submitted to GEICO.

151.    The Supplier Defendants knew that, without billing for products that they did not provide to Insureds, they would be unable to monetarily maximize the amount of money they could receive from GEICO.

152.    Therefore, the Supplier Defendants created a deceptive scheme where they would submit bills GEICO for both Fraudulent Equipment that they did not provide to the Insureds and Fraudulent Equipment that they did provide to the Insureds.

153.    By concealing the bills for both Fraudulent Equipment that they did not provide and Fraudulent Equipment that they did provide, the Supplier Defendants purposefully created a false appearance of legitimacy about the Fraudulent Equipment they purportedly provided in order to hide their deceptive scheme.

42

154.    Accordingly, in many of the claims identified within Exhibit "1", the Supplier Defendants submitted bills for Fraudulent Equipment that were never actually provided to the Insureds.

155.    As part of its investigation, GEICO confirmed the fraudulent nature of the bills submitted by Supplier Defendants, which are identified in Exhibit "1". In this context, GEICO obtained statements from Insureds, which consistently confirmed that Supplier Defendants billed for Fraudulent Equipment that they did not provide and Fraudulent Equipment that they did provide to the Insureds.

156.    For example:

(i)     On January 7, 2017, an Insured named JA was purportedly injured in a motor vehicle accident. Thereafter, JA sought treatment at a multi-disciplinary medical office on Jamaica Avenue in Hollis, New York. During her treatment, JA purportedly received a prescription for durable medical equipment that was subsequently provided to Exon. During an interview with a GEICO investigator, JA confirmed that JA never received an electric heating pad, a foam mattress, or a pillow. Despite JA never receiving those items, Exon submitted a bill to GEICO for the following: (i) a charge of $20.93 for an electric heat pad; (ii) a charges of $22.04 for a positioning cushion/pillow/wedge; and (iii) a charge of $155.52 for a foam mattress, which represented that the Supplier Defendants provided JA with those items on January 24, 2017.

(ii)    On February 25, 2017, an Insured named CL was purportedly injured in a motor vehicle accident. Thereafter, CL sought treatment with Bay Medical. During her treatment, CL purportedly received a prescription for durable medical equipment that was subsequently provided to Exon. During an interview with a GEICO investigator, CL confirmed that CL never received a heating pad. Despite CL never receiving that item, Exon submitted a bill to GEICO containing a charge for $20.93, which represented that the Supplier Defendants provided CL with a thermophore (heating pad) on March 16, 2017.

(iii)   On February 27, 2017, an Insured named DB was purportedly injured in a motor vehicle accident. Thereafter, DB sought treatment at a multi-disciplinary medical office on Jamaica Avenue in Hollis, New York. During his treatment, DB purportedly received a prescription for durable medical equipment that was subsequently provided to Exon. During an

interview with a GEICO investigator, DB confirmed that DB never received any medical equipment. Despite DB never receiving any medical equipment, Exon submitted a bill to GEICO for the following: (i) a charge of $741.59 for a lumbosacral orthotic; (ii) two charges of $22.04 for two positioning cushions/pillows/wedges; and (iii) a charge of $155.52 for a foam mattress, which represented that the Supplier Defendants provided DB with those items on February 28, 2017.

(iv)   On June 23, 2018, an Insured named DB was purportedly injured in a motor vehicle accident. Thereafter, DB sought treatment with Harbor Medical. During his treatment, DB purportedly received a prescription for durable medical equipment that was subsequently provided to Exon. During an interview with a GEICO investigator, DB confirmed that DB never received a heating pad, any pillows or cushions, or a foam mattress. Despite DB never receiving those items, Exon submitted a bill to GEICO for the following: (i) a charge of $20.93 for an electric heat pad; (ii) two charges of $22.04 for two positioning cushions/pillows/wedges; and (iii) a charge of $155.52 for a foam mattress, which represented that the Supplier Defendants provided CL with those items on July 13, 2018.

(v)   On July 29, 2018, an Insured named LB was purportedly injured in a motor vehicle accident. Thereafter, LB sought treatment at a multi-disciplinary medical office on Jamaica Avenue in Hollis, New York. During her treatment, LB purportedly received a prescription for durable medical equipment that was subsequently provided to Exon. During an interview with a GEICO investigator, LB confirmed that LB never received a heating pad. Despite LB never receiving that item, Exon submitted a bill to GEICO containing a charge for $20.93, which represented that the Supplier Defendants provided LB with a thermophore (heating pad) on August 16, 2018.

157.   This is only a representative sample. In many of the claims identified within Exhibit "1", the Supplier Defendants fraudulently misrepresented in their billing to GEICO that they provided Fraudulent Equipment to the Insureds, and where therefore eligible to collect No-Fault Benefits in the first instance.

## 2.   The Supplier Defendants' Fraudulently Misrepresented the Type of Fraudulent Equipment that was Purportedly Provided

158.   When the Supplier Defendants' submitted bills to GEICO regarding Fraudulent Equipment, each of the bills contained HCPCS codes that were used to describe the type of Fraudulent Equipment purportedly provided to the Insureds.

159.    As indicated above, the NY Fee Schedule provides that the Medicaid Fee Schedule is used to determine the amount to pay for DME and/or OD. The Medicaid Fee Schedule specifically defines the requirements for each HCPCS code used to bill for DME and/or OD.

160.    Additionally, Noridian provide specific characteristics and requirements that a Fee Schedule item must meet in order to qualify for reimbursement under a specific HCPCS code.

161.    By submitting bills to GEICO containing specific HCPCS Codes the Supplier Defendants represented that Fraudulent Equipment they purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

162.    However, with the exception of codes relating to positioning pillows/cushions under HCPCS E0190 and electric heating pads under HCPCS E0215, in virtually all of the claims for Fraudulent Equipment identified in Exhibit "1", when the Supplier Defendants' submitted bills to GEICO they fraudulently represented to GEICO that the HCPCS codes used to bill GEICO was accurate and appropriate for Fraudulent Equipment purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

163.    The prescriptions from the healthcare providers contained vague and generic terms for Fraudulent Equipment to be provided to the Insureds. By contrast, the Supplier Defendants' submitted bills to GEICO containing HCPCS codes that represented more expense tier of Fee Schedule items than necessary and that could be provided based upon the type of equipment identified in the vague and generic prescriptions.

164.    As indicated above, it was part of the predetermined fraudulent protocols in exchange for various forms of consideration that the Referral Defendants and other healthcare

providers would provide the Supplier Defendants with the opportunity to maximize the amount they could bill GEICO for Fraudulent Equipment purportedly provided to the Insureds.

165.    Accordingly, the Referral Defendants and other healthcare providers purposefully provided prescriptions to the Supplier Defendants that contained general categories of Fraudulent Equipment to purportedly provide the Insureds.

166.    Based upon the vague and generic prescriptions that the Supplier Defendants received, the Supplier Defendants were able to choose between multiple types of products that would fit the vague description contained on the prescription.

167.    Although several options were available to the Supplier Defendants based upon the vague and generic prescriptions, the Supplier Defendants virtually always billed GEICO – and likely other New York automobile insurers – using HCPCS Codes with significantly higher reimbursement amounts than necessary, which was done so for their financial benefit.

168.    However, despite billing for Fraudulent Equipment using HCPCS Codes that had higher than necessary reimbursement amounts, to the extent that the Supplier Defendants provided any of Fraudulent Equipment, the HCPCS codes in the bills submitted to GEICO severely misrepresented the type of Fraudulent Equipment that was purportedly provided to the Insureds.

169.    For example, as identified in the claims contained within Exhibit "1", the Supplier Defendants used the vague and generic language in the prescriptions to bill GEICO for over 1,100 units of lumbar-sacral orthotics under HCPCS Code L0650 with a charge of $741.59 for each unit.

170.    However, the bills to GEICO for HCPCS Code L0650 fraudulently misrepresented the type of Fraudulent Equipment the Supplier Defendants purportedly provided

to Insureds as the lumbar-sacral orthotics they provided – to the extent that the lumbar-sacral orthotics were actually provided – were not reimbursable under HCPCS Code L0650.

171.    HCPCS Code L0650 is a Fee Schedule item and is defined as follows:

> Lumbar-sacral orthosis, sagittal-coronal control, with rigid anterior and posterior frame/panel(s), posterior extends from sacrococcygeal junction to T-9 vertebra, lateral strength provided by rigid lateral frame/panel(s), produces intracavitary pressure to reduce load on intervertebral discs, includes straps, closures, may include padding, shoulder straps, pendulous abdomen design, prefabricated, off-the-shelf

172.    Essentially, the product assigned to HCPCS Code L0650 is a back brace with rigid panels that for the anterior, posterior, and lateral parts of the lumbar spine.

173.    However, despite billing GEICO – and other New York automobile insurers – using HCPCS Code L0650, the specific lumbar-sacral orthotic provided by the Supplier Defendants – to the extent that the Supplier Defendants provided the Insureds with any lumbar-sacral orthotics – did not contain the following requirements set forth in HCPCS Code L0650: (i) rigid panels; (ii) lateral support; and/or (iii) extend to the proper portions of the spine, i.e. from the sacrococcygeal junction to the T-9 vertebra.

174.    Upon information and belief, the lumbar-sacral orthotics provided – to the extent that any were provided – were flexible materials that would have been properly billed under HCPCS Code L0628, which is a Fee Schedule item defined as follows:

> Lumbar sacral orthosis, flexible, provides lumbo-sacral support, posterior extends from sacrococcygeal junction to T-9 vertebra, produces intracavitary pressure to reduce load on the intervertebral discs, includes straps, closures, may include stays, shoulder straps, pendulous abdomen design, prefabricated, off-the-shelf

175.    By contrast to the fraudulent charges submitted by the Supplier Defendants for $741.59 for each unit of a lumbar-sacral orthotic under HCPCS Code L0650 – and in keeping with the fact that the fraudulent charges were part of the Supplier Defendants' scheme to defraud

GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement amount of $65.92 for each unit under HCPCS Code L0628.

176. In each of the claims identified within Exhibit "1" where the Supplier Defendants billed for Fraudulent Equipment under HCPCS Code L0650, each of the bills fraudulently mispresented that the Supplier Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code L0650.

177. Furthermore, the claims identified in Exhibit "1" for HCPCS Code L0180 is another example of how the Supplier Defendants fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds – to the extent that Fraudulent Equipment were actually provided.

178. Similar to the bills for lumbar-sacral orthotics, similar to the allegations in the Allstate Action, and as described above, the Supplier Defendants used the vague and generic language in the prescriptions to bill GEICO for over 800 units of cervical collars under HCPCS Code L0180 with a charge of $233.00 per unit.

179. However, the bills to GEICO for HCPCS Code L0180 fraudulently misrepresented the type of Fraudulent Equipment the Supplier Defendants purportedly provided to Insureds as the cervical collars they provided – to the extent that the cervical collars were actually provided – were not reimbursable under HCPCS Code L0180.

180. HCPCS Code L0180 is a Fee Schedule item and is defined as a "cervical, multiple post collar, occipital/mandibular supports, adjustable". Essentially, the product assigned to HCPCS Code L0180 is a cervical collar with additional support for either the lower-back of the head (occipital bone) or the jawbone (mandible bone).

181.    However, despite billing GEICO – and other New York automobile insurers – using HCPCS Code L0180, the specific cervical collars provided by the Supplier Defendants – to the extent that the Supplier Defendants provided the Insureds with any cervical collars – did not have multiple posts that supported either the back of the head (occipital bone) or the jawbone (mandible bone) as required by HCPCS Code L0180.

182.    Upon information and belief, the cervical collars provided – to the extent that any were provided – were either: (i) flexible foam cervical collars that would have been properly billed under HCPCS Code L0120, which is a Fee Schedule item defined as a "cervical, flexible, non-adjustable, prefabricated, off-the-shelf (foam collar)"; or (ii) pre-fabricated, semi-rigid thermoplastic two-piece collars that would have been properly billed under HCPCS Code L0172, which is a Fee Schedule item defined as a "cervical, collar, semi-rigid thermoplastic foam, two-piece, prefabricated, off-the-shelf."

183.    By contrast to the fraudulent charges submitted by the Supplier Defendants for $233.00 for each cervical collar under HCPCS Code L0180 – and in keeping with the fact that the fraudulent charges were part of the Supplier Defendants' scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement amount of: (i) $6.80 for each unit under HCPCS Code L0120; and (ii) $75.00 for each unit under HCPCS Code L0172.

184.    In each of the claims identified within Exhibit "1" where the Supplier Defendants billed for Fraudulent Equipment under HCPCS Code L0180, each of the bills fraudulently mispresented that the Supplier Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code L0180.

185.   In addition to the orthotic equipment, and also similar to the allegations in the Allstate Action, the claims identified in Exhibit "1" for HCPCS Code E0272 is another example of how the Supplier Defendants fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds – to the extent that Fraudulent Equipment were actually provided.

186.   In each of the claims identified within Exhibit "1" for HCPCS Code E0272, which contained a charge for $155.52, the bills submitted to GEICO was based upon a prescription for a "mattress."

187.   Although the prescription for a "mattress" was vague and generic, and could be associated to multiple HCPCS Codes, the product represented by HCPCS Code E0272 is defined a foam or rubber mattress.

188.   However, despite billing GEICO – and other New York automobile insurers – using HCPCS Code E0272, the items provided by the Supplier Defendants – to the extent that the Supplier Defendants provided the Insureds with any item in response to the prescriptions for mattresses – were not foam or rubber mattresses as required by HCPCS Code E0272.

189.   Upon information and belief, the items provided – to the extent that any were provided – were mattress pad/topper in the shape of egg crates, not an actual mattress that would have been properly billed under HCPCS Code L0199, which is a Fee Schedule item defined as a "Dry pressure pad for mattress, standard mattress length and width."

190.   By contrast to the fraudulent charges submitted by the Supplier Defendants for $155.52 for each mattress under HCPCS Code E0272 – and in keeping with the fact that the fraudulent charges were part of the Supplier Defendants' scheme to defraud GEICO and other

automobile insurers – the Fee Schedule sets a maximum reimbursement amount of $19.48 for each unit under HCPCS Code L0199.

191.   In each of the claims identified within Exhibit "1" where the Supplier Defendants billed for Fraudulent Equipment under HCPCS Code E0272, each of the bills fraudulently mispresented that the Supplier Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0272.

192.   In each of the claims identified within Exhibit "1", the Supplier Defendants fraudulently misrepresented in their billing to GEICO that Fraudulent Equipment they purportedly provided to the Insureds – to the extent that Fraudulent Equipment were actually provided – accurately corresponded with the HCPCS Codes used in the bills to GEICO, and where therefore eligible to collect No-Fault Benefits in the first instance.

## III.   The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

193.   To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and/or treatment reports to GEICO through and in the name of Exon, seeking payment for Fraudulent Equipment.

194.   The NF-3 forms, HCFA-1500 forms and treatment reports that Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

> (i)   The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Supplier Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were eligible to receive No-Fault Benefits. In fact, the Supplier Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Supplier Defendants provided any of Fraudulent Equipment, it was based upon predetermined fraudulent protocol as a result of unlawful financial arrangements and without regard for the medical necessity of the items.

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Supplier Defendants provided Fraudulent Equipment to Insureds, and therefore were eligible to receive no-fault benefits. In fact, the Supplier Defendants were not entitled to receive no-fault benefits because Fraudulent Equipment was never provided to the Insureds.

(iii)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Supplier Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form, and therefore were eligible to receive No-Fault Benefits. In fact, the Supplier Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Supplier Defendants provided any Fraudulent Equipment to the Insureds – Fraudulent Equipment did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms, HCFA-1500 forms, and treatment notes.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

195.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

196.    To induce GEICO to promptly pay the fraudulent charges for Fraudulent Equipment, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

197.    Specifically, they knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were – not based upon medical necessity but – based upon predetermined fraudulent protocols as a result of unlawful financial arrangements, were provided to the Supplier Defendants, and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

198.    Furthermore, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons, without

legal authority to issue a prescription, and not by an actual healthcare provider, in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

199.    Additionally, the Defendants knowingly misrepresented and concealed that Fraudulent Equipment billed to GEICO were never actually provided to Insureds in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

200.    Lastly, the Defendants knowingly misrepresented and concealed that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the Supplier Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment provided to the Insureds in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

201.    Once GEICO began to suspect that the Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that they submit additional verification, including but not limited to, examinations under oath to determine whether the charges submitted through the Defendants were legitimate. Nevertheless, in an attempt to conceal their fraud, the Defendants failed and/or refused to respond to all of GEICO's requests for verification of the charges submitted.

202.    GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

203.    In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-

Fault Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

204.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

205.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $360,000.00 based upon the fraudulent charges.

206.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against Exon**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

207.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 206 of this Complaint as if fully set forth at length herein.

208.    There is an actual case in controversy between GEICO and Exon regarding more than $375,000.00 in fraudulent billing that has been submitted to GEICO in the name of Exon.

209.    Exon has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based – not upon medical necessity but – pursuant to predetermined fraudulent protocols as a result of unlawful financial

arrangements designed solely to financially enrich Exon, the other Defendants, and others who are not presently known, rather than to treat the Insureds.

210.     Exon has no right to receive payment for any pending bills submitted to GEICO because Exon purportedly provided Fraudulent Equipment as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions.

211.     Exon has no right to receive payment for any pending bills submitted to GEICO because Exon fraudulently misrepresented that Fraudulent Equipment were provided to Insureds when the Insureds never received the Fraudulent Equipment.

212.     Exon has no right to receive payment for any pending bills submitted to GEICO because – to the extent Exon actually provided any Fraudulent Equipment – Exon fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds.

213.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of Exon.

**SECOND CAUSE OF ACTION**
**Against Yevdosin and Masters**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

214.     GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 206 of this Complaint as if fully set forth at length herein.

215.     Exon is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

216.     Yevdosin and Masters knowingly conducted and/or participated, directly or indirectly, in the conduct of Exon's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over five years seeking payments that Exon was not eligible to receive under the New York No-Fault Laws because: (i) Exon submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based – not upon medical necessity but – upon predetermined fraudulent protocols as a result of unlawful financial arrangements designed solely to financially enrich the Defendants and others who are not presently known; (ii) Exon submitted bills to GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of decisions made by laypersons without proper prescriptions issued by healthcare providers who are licensed to issue such prescriptions; (iii) Exon submitted bills to GEICO for Fraudulent Equipment that it never provided to Insureds; and (iv) to the extent that Exon actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the type of Fraudulent Equipment actually provided. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

217.     Exon's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Yevdosin and Masters operate Exon, insofar as Exon is not engaged as a legitimate supplier of DME and/or OD, and therefore, acts of mail fraud are essential in order for Exon to function. Furthermore, the intricate planning required to carry out and conceal the

predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Yevdosin and Masters continue to submit and attempt collection on the fraudulent billing submitted by Exon to the present day.

218.    Exon is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Exon in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

219.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $360,000.00 pursuant to the fraudulent bills submitted through Exon.

220.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Yevdosin, Masters, Hanna, Clarke, and John Doe Defendants 1-10**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

221.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 206 of this Complaint as if fully set forth at length herein.

222.    Exon is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

223.    Yevdosin, Masters, Hanna, Clarke, and John Doe Defendants 1-10 are owners of, employed by, or associated with the Exon enterprise.

224.    Yevdosin, Masters, Hanna, Clarke, and John Doe Defendants 1-10 knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct

of Exon's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over five years seeking payments that Exon was not eligible to receive under the New York No-Fault Laws because: (i) Exon submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based – not upon medical necessity but – upon predetermined fraudulent protocols as a result of unlawful financial arrangements designed solely to financially enrich the Defendants and others who are not presently known; (ii) Exon submitted bills to GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of decisions made by laypersons without proper prescriptions issued by healthcare providers who are licensed to issue such prescriptions; (iii) Exon submitted bills to GEICO for Fraudulent Equipment that it never provided to Insureds; and (iv) to the extent that Exon actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the type of Fraudulent Equipment actually provided. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".  Each such mailing was made in furtherance of the mail fraud scheme.

225.    Yevdosin, Masters, Hanna, Clarke, and John Doe Defendants 1-10 knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

226.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $360,000.00 pursuant to the fraudulent bills submitted through Exon.

227.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Exon, Yevdosin, and Masters**
**(Common Law Fraud)**

228.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 206 of this Complaint as if fully set forth at length herein.

229.    Exon, Yevdosin, and Masters intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for Fraudulent Equipment.

230.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols as a result of unlawful financial arrangements and not based upon medical necessity, which were used to financially enrich those that participated in the scheme; (ii) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iii) in many claims, that

the Fraudulent Equipment was provided to the Insureds when the Fraudulent Equipment were never provided; and (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO.

231.    Exon, Yevdosin, and Masters intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Exon that were not compensable under the No-Fault Laws.

232.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $360,000.00 pursuant to the fraudulent bills submitted by the Supplier Defendants through Exon.

233.    The Supplier Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

234.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Exon, Yevdosin, and Masters**
**(Unjust Enrichment)**

235.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 206 of this Complaint as if fully set forth at length herein

236.    As set forth above, the Supplier Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

237.    When GEICO paid the bills and charges submitted by or on behalf of Exon for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Supplier Defendants' improper, unlawful, and/or unjust acts.

238.    The Supplier Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Supplier Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

239.    The Supplier Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

240.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $360,000.00.

### SIXTH CAUSE OF ACTION
**Against Hanna, Clarke, and John Doe Defendants 1-10**
**(Aiding and Abetting Fraud)**

241.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 206 of this Complaint as if fully set forth at length herein

242.    Hanna, Clarke, and John Doe Defendants 1-10 knowingly aided and abetted the fraudulent scheme perpetrated against GEICO by the Supplier Defendants.

243.    The acts taken by Hanna, Clarke, and John Doe Defendants 1-10 in furtherance of the fraudulent scheme include knowingly: (i) providing prescriptions for Fraudulent Equipment that were billed to GEICO by the Supplier Defendants pursuant to predetermined fraudulent protocols as a result of unlawful financial arrangements and without regard for medical necessity; (ii) providing prescriptions for Fraudulent Equipment that were intentionally generic and vague so as to allow the Supplier Defendants to unlawfully decide the specific type of Fraudulent Equipment to purportedly provide Insureds, and subsequently bill GEICO; (iii)

participating in each of the foregoing acts with knowledge that the prescriptions would be used by the Supplier Defendants to support their fraudulent claims; and (iv) ensuring that the prescriptions for Fraudulent Equipment were given to the Supplier Defendants rather than to the patients.

244.    The conduct of Hanna, Clarke, and John Doe Defendants 1-10, as more fully described above, were in furtherance of the fraudulent scheme and were significant and material.

245.    The conduct of Hanna, Clarke, and John Doe Defendants 1-10, as more fully described above, were a necessary part of and were critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for the Supplier Defendants to bill GEICO for Fraudulent Equipment.

246.    Hanna, Clarke, and John Doe Defendants 1-10 each aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges for Fraudulent Equipment that were not compensable under the No-Fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

247.    The conduct of Hanna, Clarke, and John Doe Defendants 1-10 caused GEICO to pay money based upon the fraudulent charges submitted to it through Exon in an amount to be determined at trial, but in no event less than $360,000.00.

248.    The extensive fraudulent conduct of Hanna, Clarke, and John Doe Defendants 1-10 demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

249.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**JURY DEMAND**

250.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.      On the First Cause of Action against Exon, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Exon has no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of action against Yevdosin and Masters, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $360,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Yevdosin, Masters, Hanna, Clarke, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $360,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Exon, Yevdosin, and Masters, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $360,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Exon, Yevdosin, and Masters, more than $360,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

F.      On the Sixth Cause of Action against Hanna, Clarke, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $360,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: June 2, 2020
      Uniondale, New York

RIVKIN RADLER LLP

By: _/s/ Barry I. Levy_
      Barry I. Levy (BL 2190)
      Michael A. Sirignano (MS 5263)
      Michael Vanunu (MV 4167)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*